# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| Kris Westerman, Joseph Stephens, Carlos Garcia, Calixto Sanchez, Chris Holsinger, Dustin Wooddell, Emilio Campos, Kenneth Griffin, Lucky Diggles, Marcel Busto and Shawn Norton,<br>    Plaintiffs,<br>v.<br><br>Capstone Logistics LLC and LMS Intellibound, LLC<br>    Defendants. | CA No.: 14-cv-3452-P<br><br><br><br>Jury Demanded |

### PLAINTIFFS' SUPPLEMENTAL APPENDIX FILED UNDER SEAL

Exhibit BB  Excerpts from Deposition of Chip Andrews      A826

                Respectfully submitted,

              By:  */s/ Chris R. Miltenberger*
                 Chris R. Miltenberger
                 Texas Bar Number: 14171200

              **The Law Office of Chris R. Miltenberger, PLLC**

              1340 N. White Chapel, Suite 100
              Southlake, Texas 76092-4322
              817-416-5060 (office)
              817-416-5062 (fax)
              chris@crmlawpractice.com

              **Attorney for Plaintiffs**

### CERTIFICATE OF SERVICE

The undersigned certifies that on October 14, 2015 the foregoing document was filed electronically in compliance with the Local Rules. As such, this document was served on all counsel of record who are deemed to have consented to electronic service.

By:  */s/ Chris R. Miltenberger*
Chris R. Miltenberger

# EXHIBIT BB

Plaintiffs' Appendix 826

1    A.   No.  I mean, they have choices.  They make
2 their own choices; I don't make them for them.
3    Q.   We've all got choices, don't we?
4    A.   Yes, we do.
5    Q.   And we've got choices where we can alter time
6 records if we want, don't we?
7         MS. PALAMOUNTAIN:  Objection.
8    A.   No, I've never done that, so I wouldn't know.
9 I had it done to me for six years at Ben E. Keith; I
10 would never do that.  I've always been there for all the
11 employees, every one on your list.  I go out there and
12 help them work every day so we don't have to hire more
13 people, so they can make more money.  I mean, ask just
14 Uncle Sam if they made more in 2011 and '12 than they
15 did in '10 and '09.
16    Q.   (By Mr. Miltenberger)  So if they hire more
17 employees, then those individual pool employees are
18 going to make less money, aren't they?
19    A.   Yes, because it's a smaller piece of the pie.
20    Q.   Because instead of having 12 employees, now
21 you've got 15 employees, for example?
22    A.   When I first started there, there was like 15,
23 and I whittled it down to 12, to where either like 9 or
24 10 were working each day.
25    Q.   And the less people that work, provided they do

```
 1      Q.   And apparently, at Ben E. Keith, they -- you've
 2   said you had it done to you, so someone didn't have your
 3   back at Ben E. Keith; is --
 4      A.   Definitely not.
 5      Q.   What was -- at Ben E. Keith, LMS was still the
 6   employer; is that right?
 7      A.   Yeah.  The whole time I was there, it was
 8   always LMS.
 9      Q.   And who did not have your back at Ben E. Keith?
10      A.   The manager.
11      Q.   What would he do to indicate to you that he
12   didn't have your back?
13      A.   I mean, we just knew that we were working more
14   than 40 hours, but we were never showed working more
15   than 40 hours.  And at Ben E. Keith, we used to work the
16   truck from like 5:00 a.m. till 11:00 a.m., and then
17   after that, we would be working basically for free, not
18   making any more money, helping out Ben E. Keith, because
19   in our field, we're kind of like Cinderella; so whatever
20   the host asks or tells us to do, we just do it.
21      Q.   So you'd work from 5:00 till 11:00.  You'd get
22   clocked out -- at Ben E. Keith, you'd get clocked out.
23   There would be more work to be done, and it had to get
24   done, so y'all did it?
25      A.   Yeah.  Pretty much every day, we were showing
```

1   7 and a half, 8 hours' work, even though we may be there
2   9 hours, 10 hours.
3       Q.   And did Shawn Norton work with you there?
4       A.   Him and Lucky came over there when they took a
5   vacation from Kroger.  So I know they were there like
6   one week, but they didn't work with me.  I mean, mainly,
7   they were on the other side of the building.
8       Q.   And did anything happen at Ben E. Keith so that
9   that practice of shorting the hours stopped?
10      A.   I mean, I have no idea.  I haven't been there,
11  but I know that the manager that was there then is not
12  there anymore.
13      Q.   Did you ever make complaints to him that:
14  We're getting shorted?
15      A.   No.
16      Q.   Why not?
17      A.   Because I was raising my two boys by myself,
18  and it was me and 19 illegals at Ben E. Keith.
19      Q.   So why did you not make a complaint?
20      A.   Because I needed my 800-and-some dollars I got
21  every week to raise my two boys.
22      Q.   Did any of the other employees there make any
23  complaints at Ben E. Keith?
24      A.   Well, pretty much they were illegal, so they
25  really couldn't complain too much.  I mean, eventually,

```
 1   it got to where they complained and they basically
 2   cleaned house, because like I said, the manager that was
 3   there when I was there, he's not there anymore.
 4        Q.   So why would he have been shorting your hours?
 5        A.   I have no idea.  Probably for bonuses or
 6   something.  I don't know.
 7        Q.   So that he individually could get a bonus if he
 8   showed less labor hours?
 9        A.   I guess.  I mean, the same thing I was told
10   to -- by the associates at Kroger, that the same thing
11   was happening to them, which I have no reason to not
12   believe them because it was happening to me over there.
13   But that's why the manager before I got to Kroger got
14   fired also, for basically the same thing.
15        Q.   And when did that happen, that the manager at
16   Kroger got fired?
17        A.   Either 2011 or the end of 2010.  When I first
18   started there, there was no manager for, like, two
19   months until they hired Bill Dean.  And then he was
20   there a while, until he was replaced by Pablo Garcia,
21   because he got promoted.
22        Q.   So who were the employees that told you that
23   the same thing was happening at Kroger as you just
24   described at Ben E. Keith --
25             MS. PALAMOUNTAIN:  Objection, form.
```

```
 1      Q.   (By Mr. Miltenberger) -- with regard to
 2   shorting hours?
 3              THE WITNESS:  Answer?
 4              MS. PALAMOUNTAIN:  Yeah.
 5      A.   Shawn Norton and Lucky Diggles.
 6      Q.   (By Mr. Miltenberger) So at some point in
 7   time, you came over to Kroger from Ben E. Keith --
 8      A.   Uh-huh.
 9      Q.   -- and you had a conversation with Shawn and
10   Lucky about at Ben E. Keith, you were being shorted
11   hours; is that true?
12              MS. PALAMOUNTAIN:  Objection, form.
13      A.   No, I don't think that we ever had a
14   discussion.
15      Q.   (By Mr. Miltenberger) Well, then Shawn and
16   Lucky told you that somebody was shorting their hours at
17   Kroger, right?
18      A.   Yeah.
19      Q.   And did you tell them:  The same thing was
20   happening to me at Ben E. Keith?
21      A.   Probably.
22      Q.   So you did have some discussion with Shawn and
23   Lucky that:  The same thing that's happening with you at
24   Kroger was happening with me at Ben E. Keith, correct?
25      A.   Probably, yes.
```

```
 1      Q.   And that would have happened recently -- well,
 2   not "recently," but soon after you began work at Kroger?
 3           MS. PALAMOUNTAIN:  Objection, form.
 4      A.   Yeah.  It's probably right after I first
 5   started.
 6      Q.   (By Mr. Miltenberger)  And so based on your
 7   experiences at Ben E. Keith, have you been particularly
 8   aware to make sure that everybody is clocked in and
 9   clocked out exactly right at Kroger?
10      A.   Yeah.  I've always been behind my workers.  I
11   mean, if you treat your workers right, they'll treat you
12   right.
13      Q.   I understand that principle.  But my question
14   is:  Have you always made sure that they accurately
15   clocked in and out at Kroger?
16      A.   When they -- when they have the badge and then
17   when they're signing it, they're initialing off on
18   everything.  So as far as I know, they're doing what
19   they're supposed to do.
20      Q.   And are they initialing off their time in order
21   to get their paycheck?
22           MS. PALAMOUNTAIN:  Objection.
23      A.   No.
24           MS. PALAMOUNTAIN:  I think you're talking
25   about two different things.  He may be talking about the
```

1    Q.    And so -- but in the normal process, other than
2    Kenny, they would sign for the hours prior to receiving
3    the 5:00 a.m. paycheck or direct deposit on Friday;
4    correct?
5    A.    Like I said, I don't know when anyone else got
6    paid, other than when Kenny signed for his hours on
7    Wednesday, he said that he already knew from the night
8    before what his hours was and his pay.
9    Q.    Do you have direct deposit?
10   A.    Yes, I do.
11   Q.    So if the employees were treated like you and
12   their direct deposit occurred the same time yours did,
13   then they would have signed for their hours prior to the
14   direct deposit in the normal course of scheme [sic]; is
15   that right?
16   A.    But like I said, I have no idea when anyone
17   gets paid.
18   Q.    No.  I'm making the assumption the employees
19   got paid just like you do.  In that instance --
20   A.    I know Wednesday is before Friday.
21   Q.    So the answer would be: Yes, they would have
22   signed before they got paid, correct?
23   A.    I mean, if I was signing on Wednesday, it would
24   be before I got paid.
25   Q.    And the problems you had at Ben E. Keith with

```
 1  getting your hours shorted, have you heard of those
 2  problems at other facilities around the country?
 3       A.   I mean, pretty much everyone thinks it was
 4  happening everywhere.  Then they cleaned house, so
 5  hopefully it's not happening anymore.
 6       Q.   When you say "everywhere," all around the
 7  country at the LMS facilities, that was happening?
 8            MS. PALAMOUNTAIN:  Objection, form.
 9       A.   I have no idea.  That's what everyone said, but
10  I have not been to every one.
11       Q.   (By Mr. Miltenberger)  I understand. And when
12  you say "that's what everyone said," I'm trying to find
13  what you base that on.
14       A.   Just employees talking to other employees.  I
15  mean, we have road crews or different people come in, or
16  I was on road crews and went different places.
17       Q.   Do you understand that there's a nationwide
18  lawsuit claiming that employees are being shorted hours?
19       A.   For this company or --
20       Q.   Yes, for this company.
21       A.   No, I didn't know that.  I mean, it doesn't
22  surprise me.
23       Q.   Why is that?
24       A.   Because I know in the past that it has
25  happened.
```

```
 1      Q.   So was this prior to you becoming a --
 2      A.   Making extra money.
 3      Q.   -- a second-shift supervisor?
 4      A.   Yes.  I've never been on a road crew since I've
 5 been with Kroger.
 6      Q.   So when you would go on a road crew and go out,
 7 you would talk to other employees at the other
 8 warehouses?
 9      A.   Yeah.  I pretty much was the designated driver
10 because I didn't drink, so whenever we went out, I drove
11 and --
12      Q.   And so you understood from talking to those
13 employees that they also, at various warehouses, thought
14 their hours were being shorted?
15              MS. PALAMOUNTAIN:  Objection, form.
16      A.   I've had other people tell me that they thought
17 they weren't getting paid right.
18      Q.   (By Mr. Miltenberger)  And that was -- they
19 told you that from warehouses all around the country?
20      A.   Well, a few different ones, yeah, that I've
21 been to.
22      Q.   And which ones would they have told you that
23 from?
24      A.   I mean, I went to the Kroger in Compton, and I
25 went to -- I don't know what the main host's name was,
```

```
 1   but it was in Ogden, Utah.  And like I said, when I'd go
 2   to these sites, there may be people there from five, ten
 3   other different sites also.
 4        Q.   Okay.  So your background would be -- your
 5   knowledge would be that LMS facilities around the
 6   country were shorting people hours?
 7             MS. PALAMOUNTAIN:  Objection, form.
 8        Q.   (By Mr. Miltenberger)  Let me just follow
 9   through with the question.  Is that basically true?
10        A.   Prior to 2011, I believe so.
11        Q.   Okay.  And in 2011, when you got to Kroger and
12   when LMS cleaned house, that problem went away; is that
13   right?
14        A.   At our site.  I don't know about nationally,
15   because I've never been anywhere since then.
16        Q.   And have y'all had road crews come in to you
17   where you are, at Keller Kroger?
18        A.   We've only had two road crews, and they
19   basically worked the morning, helping select.
20        Q.   So you really didn't interact with them?
21        A.   No, I didn't really have any interaction with
22   them.
23        Q.   If you were going to change the employees'
24   time, how would you do that?
25        A.   I never would change their time.
```

```
 1  reported --
 2              MS. PALAMOUNTAIN:  Objection, form.
 3     Q.   (By Mr. Miltenberger)  -- if they turn out to
 4  be correct --
 5              MS. PALAMOUNTAIN:  Objection, form.
 6     Q.   (By Mr. Miltenberger)  -- isn't that right?
 7     A.   Well, all I know is since I've been there in
 8  June of 2011, they've all been -- all their hours have
 9  been reported --
10     Q.   I understand, Mr. Andrews --
11     A.   -- as to my knowledge when I'm there.
12     Q.   I understand that you're testifying to that;
13  that you're testifying that everywhere else in the
14  country, they did it wrong, and you're the only place
15  that did it right.
16     A.   No, I'm not saying that.
17     Q.   But the jury will ultimately decide who's right
18  and who's wrong.
19     A.   I --
20     Q.   And my question is:  If they -- you have not
21  recorded the hour, then they are entitled to time and a
22  half for the hour that you haven't recorded, correct?
23              MS. PALAMOUNTAIN:  Objection, form.  This
24  witness is not an attorney and is not qualified to
25  speculate on what the law requires.
```

**Plaintiffs' Appendix 837**

 1      A.   And you're putting words in my mouth.  I didn't
 2 say every other site is doing that.  I'm saying people
 3 that I've come across over the years prior to 2010 had
 4 complained of the same things that was happening to me
 5 at Ben E. Keith, and that's just speculating.  That's
 6 them telling me; that's not me going to their site and
 7 knowing that it's really happening.
 8      Q.   (By Mr. Miltenberger)  You were going to your
 9 site, and they told you that at the site, didn't they?
10      A.   No.  Like I said, when we go to a road crew,
11 not only is it the people that already work there, but
12 there's many people from other sites.
13      Q.   So let me get back to my question:  Would you
14 agree that if the jury finds that the hours are
15 underreported, that they're entitled to time and a half
16 for each hour that was underreported?
17           MS. PALAMOUNTAIN:  Same objection.
18      A.   I'm saying that they -- no matter what, they've
19 already been paid for the time, but yes, they would be
20 due the half, if it's found in their favor.  But I know
21 that since June of 2011, that's not the case, unless I
22 wasn't there.
23      Q.   (By Mr. Miltenberger)  How would you compensate
24 them for the lunch period that they worked through that
25 they haven't been paid for?

1  And then the -- for the -- when they got
2  to the fifth year, where I just started, is the only
3  time there was no -- but, I mean, I've been doing this
4  since '97, and it's trending that way all the time:
5  Making less money. I mean, kind of like just the
6  medical field; they make less money than they used to.
7      Q.   Not according to what I pay, but whatever.
8      A.   Well, depending on, yeah, what they're doing.
9      Q.   Do you know Shawn Norton very well?
10     A.   I just know him from -- I mean, the first time
11 I met him, pretty much, was when he came to work at Ben
12 E. Keith for that week, but like I said, I think that he
13 was only on the dry for a very short time. And he was
14 always opening the freezer because the freezer was the
15 side at that site that always needed help.
16     Q.   At Ben E. Keith?
17     A.   Yeah, because they -- I also unloaded trains
18 there.
19     Q.   Do you have any reason to think that he would
20 testify dishonestly?
21     A.   No, I don't. I mean, I know him as an honest
22 person.
23     Q.   Do you --
24     A.   I mean, I don't know. I mean, I know the
25 people that were there when I got there, that they may

1  have concerns about time before that time, which, of
2  course, I do also.
3      Q.   Looking again at the employees that are in the
4  lawsuit, who, if any, from your experience being around
5  them, do you think might be exaggerating their
6  testimony?
7           MS. PALAMOUNTAIN:  Objection, form.  I'm
8  not sure he knows what their testimony is.
9      A.   Yeah.  Some of the people speak mainly Spanish,
10 so Pablo usually talks with them every Monday.  Of all
11 these people, the person that I would most trust and
12 would say is telling the truth would be Shawn Norton.
13     Q.   (By Mr. Miltenberger)  Who is the person that
14 you would least trust?
15     A.   I mean, there's not one that sticks out to be
16 the least.
17     Q.   I'm just trying to determine why your testimony
18 is so much different from all the other people I've
19 talked to.
20     A.   Yeah.  I would like to know that also.
21          MR. MILTENBERGER:  Give me about five
22 minutes, and I think I'm about through.
23          MS. PALAMOUNTAIN:  Okay.
24          (A recess was taken from
25          5:17 p.m. to 5:25 p.m.)